[No. 22719. Department One. October 22, 1930.]

THOMAS CARSTENS, *Appellant*, v. TILLIE N. MORCK *et al.*, *Respondents.*[1]

*Kerr & McCord* and *A. M. Abel*, for appellant.
*John C. Hogan*, for respondents.

TOLMAN, J.—This is a suit in equity by a judgment creditor to set aside an alleged fraudulent conveyance

[1]Reported in 292 Pac. 262.

by his judgment debtor. The case was tried to the court. No findings of fact were made, and a judgment was entered denying relief and dismissing the action. The plaintiff has appealed.

The facts, except in one or two vital particulars, are undisputed, and, for an understanding of the questions presented, a somewhat general outline of the situation must be given.

Prior to his death on January 1, 1924, E. A. Morck had been engaged for some years in the hotel business in Aberdeen in this state, his business being incorporated under the name of Hotel Washington Company, capitalized at $200,000, and the stock divided into two thousand shares, of which Morck was the record owner of 1921 shares. For a long time, Morck and his corporation had been hampered by lack of capital, and probably, at any time in recent years, if the business had been suspended, it would have proved to be insolvent.

In 1923, there was borrowed from a bank and from a private source $31,000 on notes made by E. A. Morck and Tillie N. Morck, his wife, which were indorsed by the appellant, who was Mr. Morck's cousin. These notes were wholly unpaid at the time of Mr. Morck's death. Appellant afterwards paid them, and it was by reason of this transaction that he obtained a judgment against Tillie N. Morck for $31,300 in 1929. An execution was issued on this judgment and returned unsatisfied by the sheriff of Grays Harbor county on June 28, 1929.

Some time prior to his death, Morck conceived the idea that the Washington hotel, which he was then operating, was insufficient for the community under modern conditions; that a new, modern and up-to-date hotel would be financially successful, and, if he could construct and operate it, his financial difficulties would

thus eventually be solved. The old hotel, the Washington, was a frame building located on three lots in the business section of the city, and Morck purchased two lots across the street from the old hotel for the purpose of there erecting the new hotel, which was estimated to cost $400,000, but which actually cost considerably more.

In order to finance the new building, arrangements were made with a financial house by which a first mortgage for $195,000 was placed upon the new hotel property to secure a bond issue of that amount, and a second mortgage, securing a bond issue of $175,000, was placed upon both the new hotel property and the old hotel property. The bonds secured by this second mortgage were to be sold to the citizens of Aberdeen and vicinity who were interested in having a new hotel built. In addition to these mortgages, there was already a mortgage for $35,000 upon the Hotel Washington property, besides a mortgage upon the furniture and personal property used in the hotel.

Under this plan of financing, the erection of the new hotel was commenced in 1923 under the management of Mr. Morck, who worked faithfully to carry the plan through, but the whole enterprise became very much involved and was threatened with disaster, and, to complicate the situation, on January 1, 1924, Mr. Morck suddenly died. After his death, his will was admitted to probate in the superior court of Grays Harbor county, and his widow, the respondent, Tillie N. Morck, qualified as executrix. No claims were presented against the estate whatever, and in 1925 a decree of final settlement was entered so showing, which distributed to the respondent Tillie N. Morck the 1921 shares of the common stock of the Hotel Washington Company, and also certain real estate, then mortgaged

apparently for its full value, which was afterwards lost by foreclosure.

After the death of Mr. Morck, members of the family, his friends and associates, used every possible endeavor to prevent the whole enterprise then ending in absolute disaster. By strenuous efforts, the campaign to sell the bonds secured by the second mortgage was renewed and carried through to success, and, as a part of that campaign, the capital stock of 1921 shares of the Hotel Washington Company, which it is sought to reach in this action, was transferred to trustees for the protection of the purchasers of those bonds. That is, by vesting in the trustees full title to the stock and absolute control of the corporation, they were placed in a position to so order its affairs as would best protect the purchasers of the bonds.

Finally, without reciting all of the efforts expended and means used, the new hotel was brought to completion, but, of course, the hotel company had no money to furnish it and was in no position to operate it. Strenuous efforts were made in all proper directions to find a tenant for the new hotel, or for both hotels, who would pay sufficient rental to cover taxes, interest and maturities on the bonds, and like necessary expenditures, to keep the mortgages in good standing and prevent default. No tenant could be found except Mr. Morck's son, his son-in-law, and another young man, who had had some hotel experience, who, with the courage of youth, undertook to organize a corporation to operate the hotels; and, by borrowing from Mrs. Morck money which she received from life insurance left by her husband, they did so organize a corporation, which had $15,000 of cash capital, and which undertook to pay, as rental for the hotels, $4,000 per month, which was the minimum estimated for the carrying

charges, and more, if necessary to pay carrying charges.

This corporation was organized, the lease was made and it entered into possession and has since operated with varying success. One year, apparently, it made a very fair profit, other years but little, and some years it has operated at a loss. It has so far paid enough in rental to prevent any default in the first mortgage, but there are arrearages due under the second mortgage, which makes it possible for default to be claimed at any time, and substantial sums are long past due for taxes, which are drawing a high rate of interest.

At the time of, or very shortly after, the organization of this operating corporation, Mrs. Morck, for a consideration of $2,000 paid to her in the second mortgage bonds hereinbefore referred to, assigned all of her right, title and interest in the 1921 shares of the capital stock of the Hotel Washington Company to her son and her son-in-law who were instrumental in organizing the operating corporation, and this, apparently, upon the theory that, since these young men undertook so stupendous a load, which would keep them in financial servitude for at least twenty-seven years, if they met all their obligations promptly, and which had so many possibilities of complete and dismal failure, it was but fair to them, in the event that they finally carried the matter through to success, that they should have the stock and thus reap a substantial reward.

The matters chiefly in dispute are, Did the stock have any value? Did appellant Carstens know of the transfer of the stock by Tillie N. Morck to her son and son-in-law, at the time, and did she receive a valuable consideration for such transfer?

It appears that appellant Carstens, because of his relationship and his financial interest, was a consultant

throughout, not only during Mr. Morck's lifetime, but afterwards; and, while he denies that he knew of the transfer, everyone else who is in a position to know testifies that he knew all about it. Not only did he personally take part in these affairs, but he had a personal representative, resident in Aberdeen, who was very active in these matters throughout, and it seems impossible to believe that Mr. Carstens was not fully advised, or, at least, that his agent was not fully advised of everything which was done as it was done.

The defense to the action seems to be twofold. First, that the hotel company and Morck were insolvent; that the stock had no value, and that equity will not, at the suit of a creditor, set aside a transfer of that which has no value and would be of no advantage to the creditor if he recovers it. It might very easily be held that the Hotel Washington Company was, long before this transfer, at the time of the transfer, and ever since has been, insolvent, but there always has been and is now a possibility that it may work out its problem and that, in the end, after the lapse of many years, the stock may be of very substantial value. In the meantime, this stock controls a corporation which is a going concern, which is receiving a considerable income, although that income and more is due to its creditors, and it can hardly be said that such capital stock, with a speculative or prospective value and carrying with it control of such a corporation, is of so little value that equity will not interfere.

In order that the rule contended for should be applied, we think it must clearly appear that the property is of no substantial or commercial value, and that its recovery could not be of advantage to the creditor. Discussing a similar question, it was said in *Klosterman v. Vader,* 6 Wash. 99, 32 Pac. 1055:

"It would seem that before a creditor could ask the

interposition of a court of equity he must show that by its aid he can obtain something which will be of some value in his hands.''

While the question is not entirely free from doubt, still we think it cannot be said that this stock might not have some value in the hands of the appellant, and the judgment of the trial court cannot be affirmed upon this issue.

█ The next defense urged is that of laches. Without repeating the facts already stated, attention should be called to the fact that appellant, when Mr. Morck's estate was probated, did not present his claim. Had he done so, it is altogether possible that respondent Tillie N. Morck, as the widow, might have applied for a widow's award and thus obtained this stock free and clear from the appellant's claim. Having presented no claim, appellant continued to interest himself in the efforts being made to carry the new building to completion and to procure a tenant who could operate it, showing every interest in assisting in carrying out those objects. As a business man, he would realize, perhaps, more quickly than the young men themselves, the stupendous burden they were undertaking, by the terms of the lease into which they entered. He would know that, under all of the laws of probability, they were pledging the best part of their productive lives to the one purpose of saving the situation and carrying it through to success. Probably, too, he would realize that the chances for success were less than the opportunities for failure.

And if, under these conditions, he knew, as we have found he must have known, that these young men undertook this tremendous task in consideration of their receiving the stock, so that, in the event of success, they might receive some financial reward, and yet he stood by and said nothing, and has stood by and

permitted them to carry that burden for five or six years, he has been guilty of laches. His conduct partakes somewhat of estoppel *in pais,* and he ought not now, when he thinks conditions have been bettered by the efforts of these young men, to be permitted to step in and take from them that upon which they have relied and still rely.

The general rule is well stated in 27 C. J. 764, as follows:

"Laches. Independently of a statute of limitations, or of the expiration of the statutory period, the right to institute a suit for relief against a fraudulent conveyance may be lost in equity by the laches of the complainant. But a creditor cannot be deemed guilty of laches while the fraud remains undiscovered, unless by the exercise of ordinary diligence he might sooner have discovered it. It must always be remembered, however, that the means of knowledge are in effect the same thing as knowledge itself, and concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. The doctrine of laches has been frequently applied where the granting of the relief sought would work prejudice to defendant, as where the complainant has slept on his rights and allowed defendant to make valuable improvements or make other expenditures in reliance on his title. Laches is not, like limitation, a mere matter of time, and the question as to what constitutes laches must be determined, not only from the lapse of time, but also from the facts and circumstances of the particular case, and according to right and justice. Laches in bringing the action cannot be successfully interposed as a defense unless delay in this respect has injuriously affected the party against whom suit is brought or unless his position has been altered to be prejudiced thereby. In determining whether or not the claim is stale, the better view is that the court is not confined to the statutory period but may refuse relief in cases where the delay is less or greater than that named in the statute."

As will be seen, the stock was transferred by respondent Tillie N. Morck at the time of the organization of the operating company about June 3, 1924. Certainly the transferees gave value, whether she received value or not. Carstens did not even obtain his judgment until some five years after the transfer, during all of which time the transferees were adding to the value of the stock, and, apparently, until he brought the suit which resulted in the judgment, he was satisfied with the conditions as they were.

In our opinion, because of his laches, it would now be inequitable to set aside the transfer.

The judgment is affirmed.

MITCHELL, C. J., HOLCOMB, PARKER, and MAIN, JJ., concur.